All rise. Court is now in session. Please be seated and please call the case. Case number 317-0003. Brett Johnson, et al., opponent by Katelyn Ann Weill v. Stojan Law Office P.C. and Clark J. Stojan, athletes by Allen Law. Please be seated. Thank you and good afternoon to the court. My client, Plaintiff Brett Johnson, had the rug pulled out from under him in the circuit court and we're asking this court to set things right. Claims were still developing and discovery was still ongoing when the litigation was terminated. On this appeal, we are asking that the circuit court's December 2, 2016 order that denied Mr. Johnson's motion to reconsider entry of summary judgment and denied Mr. Johnson's motion for leave to file a second amended complaint be reversed. We're asking that the circuit court's October 6, 2016 order that awarded summary judgment against Mr. Johnson be vacated and that this case be remanded for further proceedings. We ask this court to recognize that there are outstanding issues of material fact that made termination of the case improper, that the questions of law raised by Mr. Johnson's claims should not be answered until those issues of material fact are decided. This case should be remanded back to the circuit court for completion of discovery, a full and proper consideration of the facts, both those currently outstanding and those that may arise, and the opportunity for Mr. Johnson to amend his pleadings in conformance with the facts and the theories of liability as they arise. Now, defendants' goal throughout this case has been to narrow the focus of the analysis as much as possible. They wish for this court, as they wish for the circuit court, to focus only on whether Mr. Johnson and the defendants had an attorney-client relationship. According to defendants, if there was no direct attorney-client relationship, then Mr. Johnson's claims fail because there was no duty. However, this case is not so narrow. By December 2016, when the case was terminated, Mr. Johnson had presented to the circuit court multiple bases for the conclusion that defendants owed him a duty of care. He presented evidence to support such bases and evidence that defendants had breached their duty of care. Further, during October 2016, December 2016, and beyond, those multiple bases for defendants' liability were still being explored. What theories, what bases, what theories were you working under, under contract, tort? What kind of theories were you basing this on? Breach of duty. Breach of duty under what theories? Under a tort theory? Under a contract theory? What kind of theories were you basing this on? When I say there was a duty, under what kind of legal theory were you basing this on? Under a restatement principle? Under what restatement principle or what theory under Illinois law were you basing this on? It has to come under some kind of theory, under contract, tort, statutory, what? Well, attorney-client privilege, I'm sorry, not attorney-client privilege, attorney-client relationship and the fiduciary duty that arises from that, but also the derivative fiduciary duty that a fiduciary counsel owes the beneficiaries of trust. How does this trust arise? Well, the trust was the Kampert Family Trust created by Mrs. Jean Stager, and that being one of the most important documents in the case, Mrs. Stager, during her lifetime, was the primary beneficiary, and Mr. Johnson, along with his brother, Sean Johnson, and his sister, Ms. Sibby Polite, were the contingent beneficiaries. And when did the contingency come forward? The contingency would come forward upon Mrs. Stager's death. And when did she die? She died in November of 2013. So, some of the evidence that Mr. Johnson put forward included evidence that the defendants served as attorneys for Ms. Polite as early as 2011. And at that time, there's evidence to show that Ms. Polite was acting in a fiduciary capacity, was acting as trustee of the Kampert Family Trust. But you say the defendant breached the duty when? The defendant breached the duty during early 2011. So he breached the duty before she died? Correct. So, he breached the duty before the death, but they didn't become a beneficiary until after she died, correct? Correct. But even contingent beneficiaries are standing under Illinois law when it comes to the mismanagement of trust assets. And what other factors were there with the mismanagement? Factors of the mismanagement were that Ms. Gleat was misappropriating trust funds and mismanaging them. Mr. Johnson put forth evidence that defendants knew this and aided this. Aided and abetted? Yes, acted in concert with, aided and abetted. And how was the aiding and abetting? The aiding and abetting, or acting in concert with, included the fact that defendants, specifically in this case Attorney Stojan, drafted a trust amendment while Ms. Stojan was incompetent and therefore did not have testamentary capacity. He worked with, the defendants worked with Ms. Gleat to have Ms. Stojan sign that trust amendment which removed Mr. Johnson and Shawn Johnson as co-trustees. She had a power of attorney drawn up for her to have authority to act as the agent of Ms. Stojan. So he was the attorney for, he was whose attorney? It has been Mr. Johnson's argument that he served as, the defendants served as attorney for him and Ms. Gleat and at one time Gene Stojan. So who was defendants client when is one of the main issues that needs to be fully discovered and addressed on remand. This is an issue that is important to this case because it does define various duties that defendants owe. Additionally, there is the issue of Ms. Stojan's incompetency and testamentary capacity. That is still in dispute. Mr. Johnson has put forward evidence that she was incompetent as early as late 2010 which made everything that happened in 2012. How does that put an issue for incompetency? What evidence is there of that? The evidence includes contemporaneous doctor notes and evaluations. It includes contemporaneous care journals prepared by Ms. Gleat. And it also includes Mr. Johnson's personal observations that were submitted to the circuit court as an affidavit. Ms. Leather, I have a couple of questions. There are a number of these lawsuits pending, is that correct? There are, yes. And this one is a legal malpractice claim. Correct. This is the claim against defendants who are attorneys. There are other claims against other defendants on other issues. So what is the basis for the claim that there was an attorney-client relationship between Mr. Johnson and Mr. Stojan? The basis is that it was Mr. Johnson's understanding that he was a co-trustee and he looked to Mr. Stojan to provide advice as to how to fulfill those duties and also sought advice from him with respect to working with his sister, Ms. Gleat, for purposes of properly managing the trust and curbing what Mr. Johnson has put forth evidence as her mismanagement. Okay. What he thought isn't a legal hook, I don't think, for an attorney-client relationship. What is the relationship that co-trustees have with the grantor and the original trustee if the original trustee becomes mentally incompetent and the co-trustees then take over? Does the attorney for the grantor have a duty to the co-trustees? If he comes forward and starts acting as their attorney, he does, which is what there is evidence to suggest in this case. I was asking if it's their attorneys or just Ms. Gleat? Both. Okay. Go ahead. So... It's a follow-up to my question. What law is there that you become presumptively the attorney for these people? How can you become a presumptive attorney for someone like that? As far as I know, there isn't. Which is why, in this case, it's an issue of fact under the general law of how attorney-client relationships are formed. With a putative client seeking advice and the attorney offering it. How many meetings were there between your client and Ms. Gleat where there was advice exchanged? Meetings? I don't believe any. However, it was email communications that were in the record. Between Mr. Johnson, including Shawn Johnson, sometimes, and Ms. Gleat as well. Mr. Johnson sent emails to Stojan? Correct. He and Shawn Johnson were communicating with Mr. Stojan originally. The three siblings were working in early 2011 to come up with a care plan for their mother and to take over administration of her trust. They were working with Stojan when doing that. However, when Mr. Johnson and Shawn Johnson, who was originally also a plaintiff in this case, came to believe that Ms. Gleat was asking for improper trust distributions and they wanted to make sure that she didn't mismanage the trust, they began talking with Mr. Stojan about Ms. Gleat. And Mr. Stojan informed them that he would pass along their concerns to Ms. Gleat. In addition to the issue of summary judgment, there's a separate issue in the December 2nd, 2016 order that the circuit court denied Mr. Johnson's request to amend his pleadings. Given that discovery was still ongoing at the time and in the consolidated cases, including the 2013 CH-304 case, I believe discovery is currently ongoing today, it was improper and an abuse of discretion for the court to deny Mr. Johnson leave. Interestingly enough, in the December 2nd order, which is both in the appendix at page A-1 and also in the common law record at C-937, the first paragraph denies Mr. Johnson's two motions, the motion to reconsider and the motion for requesting leave to amend. I have a question about the... There was a request for an investigation with the Attorney Registration and Disciplinary Commission, correct? Yes. And on that form that your client filled out, there was a question, did you employ the lawyer person you're complaining about? The plaintiff put an X next to the option for no, right? That is correct. And the next question was, if your answer is no to the question, what is your connection to the lawyer person? And the answer was, I'm the beneficiary of a trust and he was the attorney for the grant for the trustee. And in the lengthy letter which was stated, ongoing civil litigation against Ms. Pollack, discussed more fully below, has revealed that the attorney, Clark Stojan, improperly and concurrently served as an attorney for the Kamper Family Trust, his granddaughter, Jean Stachowiak, the trustee of Pollack. And the plaintiff made numerous claims in the letter, including the following in response to notes from the Department of Aging, investigators' conversation with Mr. Stojan. To Mr. Stojan's claim that Tom and I only inquire of him about the money, I would ask, why else would we email him? Clark was Tom's longtime attorney but not a close family friend. He wasn't in attendance at either of my sister's weddings, to my knowledge, nor did he attend Mom's retirement party or her wedding when she married George. Why would I ask questions of Clark about Mom's medical condition or care or any other personal questions for that matter when I don't even know the guy? I look forward to engaging in this complaint process with the AORGC and in the future investigation against Clark when I hope to finally get some transparency as to Clark's actions. You know, that doesn't sound like the attorney-client privilege answers, does it? You know, how do you explain that? That seems to be contradictory. It does to a certain extent, Your Honor. No, it definitely does. However, the issue is with respect to whether or not Mr. Johnson believed that Mr. Stojan was representing the trust or just his mother. Now, when he became co-trustee or believed he became co-trustee, that is correct. Mr. Johnson did not go out and hire Mr. Stojan, did not know him, or believed he was the attorney for the trust of which he was now a co-trustee. So he went to Mr. Stojan for advice. Mr. Stojan worked with Mr. Johnson, and who Mr. Johnson believed were the other co-trustees, his siblings. So while there is that response, wasn't hired, didn't know him, that wasn't necessarily the basis for why Mr. Johnson was talking with Mr. Stojan. Not because he formally hired him, not because he knew him in advance, but because he knew him as the attorney for the trust, and as a co-trustee, he was seeking counsel on how to fulfill his duties. And Mr. Stojan, there is evidence to show, responded to those requests and worked with him. Is there any evidence that Stojan was the attorney for the trust? He was the attorney for the beneficiary, the grantor, and the original trustee. And when the original trustee, the children believed, could no longer serve in that capacity, then the three co-trustees turned to the previous trustee's attorney. Did that in and of itself magically make Mr. Stojan their attorney? No. It's the facts that need to be decided. There is evidence that Mr. Johnson specifically went to Mr. Stojan, and Mr. Stojan provided advice back without limiting that in any way. Mr. Stojan's attorney relationship with, how are you saying her name, the grantor? Stager. He didn't, that relationship didn't end when she became incompetent. Is that right? He still had a duty to her. Mr. Johnson has argued and put forth evidence that she wasn't his client any longer. However, it's obviously a straight up matter of law. Her incompetency in and of itself would not have ended the attorney-client relationship. However, once again, facts and circumstances put forward by Mr. Johnson would support a conclusion that Mr. Stojan wasn't Mrs. Stager's attorney by the time of late 2010 and early 2011. What were those facts? Those facts include the evidence that Mr. Johnson put forward included that with respect to the trust, Mr. Stojan was working with Ms. Polite and Mr. Johnson and Sean Johnson, not with Mrs. Stager with respect to Mrs. Stager's care. He hadn't met with her or talked with her in some time until the March 23, 2011 meeting at which Mrs. Stager reportedly signed a trust amendment and a letter of direction. Mr. Johnson's put forth evidence that one of the reasons for defendant's liability to him is the fact that those documents were really created at the behest of Ms. Polite. And Ms. Polite was given some powers with regard to her mother, right? Correct. She was made the sole successor trustee to her mother and she was given specific authority to make certain distributions from the trust which benefited her. She was the power of attorney, wasn't she? Correct. It's believed so. Once again, the evidence put forward during discovery suggested that it is completely unclear when that document was necessarily created and who was tasked with creating it. In this case, there's evidence to suggest that Ms. Polite was the one who put it together and had her mother sign it while at Mr. Stogen's office. Correct. That is also an argument that Mr. Johnson was making to the circuit court. I have one other question. Please. If she were incompetent and Mr. Stogen was still her attorney and because of her incompetence her three co-trustees took over her care, is there some derivative legal duty that he has? To whom? Someone specifically, Your Honor? To the three co-trustees. Does his attorney-client relationship with Ms. Stogen somehow derive to the co-trustees who are acting in her respect? Not automatically, no, which is why Mr. Johnson has been arguing under the facts and the evidence he put forward, it became Mr. Stogen's duty based on his actions and the formation of a new attorney-client relationship. Thank you, Counsel. Thank you very much. May it please the Court, good afternoon. Counsel, there's only two issues on this appeal. The first is whether the trial court was correct to find as a matter of law on a plaintiff's legal malpractice action that the defendant owed no duty of care to the plaintiff. And second, whether the trial court was within its discretion to deny the plaintiff's subsequent motion for leave to file an amended complaint. The first issue on whether or not there was a duty owed to the plaintiff in this case, I think is very clear. Both on appeal and in the trial court on the motion for summary judgment, the plaintiff argued that it was a question of whether or not an attorney-client relationship was created between Mr. Stogen and the plaintiff as a result of Ms. Sager's Alzheimer's disease. Now, whether or not Ms. Sager definitely had Alzheimer's disease, but whether or not she was competent whenever she signed the trust amendment, Ms. Sager was Mr. Stogen's client. I would point out that he said that she seemed perfectly competent when she signed the document. But regardless, simply being a co-trustee on a document that's drafted by a lawyer does not create an attorney-client relationship whenever that attorney subsequently answers a question that perhaps a child had asked about it or whether or not information was requested. The issue is an attorney-client relationship is a contractual issue. It's, will you be my attorney? I agree to be your attorney. That's essentially how this works. And for a plaintiff to state that there's a question of whether or not an attorney-client relationship existed by virtue of his mother becoming incapacitated just doesn't really make sense under Illinois law. And that's why the Supreme Court in the Pelham v. Griesheimer decision actually cut off this potential. In Griesheimer v. Pelham, the Supreme Court said that an attorney only does a duty to a client. There is one exception, is that if the attorney is retained to directly benefit a third party, in which case the attorney would then owe that person a duty. But here, simply because Mr. Stoke and Mr. Johnson was at one point a successor co-trustee does not make him the attorney whenever Ms. Sager became incapacitated. If that was the case, lawyers who draft trust documents may end up becoming attorneys for people decades later without any idea of what had happened. And in this case, Mr. Stoker was originally retained in 2001 to draft a trust. And in 2011, he was asked to make a trust amendment. I think Justice McDavid had asked a question about whether or not he was representing the trust. Well, he was representing the grantor, and he was representing her in her decision to make an amendment to demote her two sons and to prefer her daughter as co-trustee. But his duty was to his client, Ms. Sager, who specifically stated, don't tell my son, she didn't want to create conflict within the family. She thought she might not be offended by it. So Mr. Johnson is now arguing that he was looking to Mr. Stojan for advice, and Mr. Stojan didn't tell him that he had been demoted, yet that was specifically what Ms. Sager, his client, told him not to do. So he's creating a duty to Mr. Stojan to breach the confidentiality owed to his client, Ms. Sager, and by doing so, he should be liable for malpractice. That just cannot be what the law is on a legal malpractice action. And Justice Carter noted the ARDC letter that Mr. Johnson wrote, that despite the legal issues, I think factually sort of just kind of destroyed his argument, two months before this legal malpractice action was filed, he tells the ARDC that Mr. Stojan is his mother's attorney, the trust attorney, his sister's attorney. He says he doesn't retain him, and then he says he doesn't even know the guy, and now we're here on appeal on a legal malpractice action to say there's a question of fact of whether or not an attorney-client relationship was ever created. Two months before you file a claim, you ought to know whether or not he was your attorney, and he's telling our regulators that Mr. Stojan wasn't his attorney. So I think both the legal issues of what his relationship was to Ms. Sager, what Mr. Johnson's relationship was just merely asking questions on its own, wouldn't create a duty, but I think that fact is highly relevant in deciding whether or not the trial court was incorrect to find as a matter of law there was no duty owed to the plaintiff. I do want to address the other issues that were raised in the brief. In the original complaint, they argued that as a remainder beneficiary, there was a duty owed. On motion for summary judgment, we argued that there wasn't any because impelment had to be a direct intended beneficiary. Here you have a spillover, essentially. They didn't address that in the response. They didn't raise it on appeal, so it's waived. But the arguments that we raised, I think, are very compelling, that simply because the money has to go somewhere, eventually if you pass away and he happened to be picked as somebody, that doesn't create the attorney-client relationship because the purpose of the trust was to preserve the money and to provide for Gene Sager. The purpose of the trust amendment, which is really what's at issue here, was to demote plaintiff and his brother. The aiding and abetting discussion, that is not a basis for duty owed to a plaintiff. That is a separate tort. In the Thornwood v. General Block case, the first district stated that though no Illinois court has ever found that an attorney aided and abetted the breach of a fiduciary duty, it's possible that such a case could exist. Of course, in that case, they found that the firm did not aid and abet. It's, I would think, rather hard to aid and abet a breach of fiduciary duty because as an attorney, you're advising your client. Your client may have a goal. I think in an accounting malpractice, there's some case law that says you really have to, like, with knowledge, know you're doing something that's improper. There hasn't, thankfully, been a case in Illinois regarding attorney aiding and abetting a breach of fiduciary duty. I imagine it's almost illegal. That would rise to that. But that's certainly not the case here. But regardless, this was never pled. That's a separate tort. And we were faced with a complaint, the First Amendment complaint, that had a claim for legal malpractice. We didn't have accounts for aiding and abetting a breach of fiduciary duty. So there was no reason for us to provide the trial court with argument about that, and the trial court didn't have the benefit of considering that argument. And so when the trial court ruled as it did, it wasn't considering whether or not a tort of aiding and abetting had evidence to go forward. So on appeal, plaintiff can't be able to say, now this needs to be reversed because the case is ongoing and we've got different theories. You have your complaint. That's where you've got to put your theories in the complaint. Under the Code of Civil Procedure, neither the trial court nor the defense is supposed to guess at what it is plaintiff really thinks they're arguing about. They have to plead that, and they didn't here. Finally, on the amended complaint. Can I ask a question? What is this tort contract? When I looked at the book we have below, there wasn't a basis in contract or tort about this aiding and abetting. No, there was not. And so, but on the briefs, they talk about it. Correct. But there was nothing in plan, contract, and tort about it. No, there was not. The only suggestion of it is, I believe, in the briefs, they reference in our brief that they do cite to the Thornwood case, but that's in response to our argument that there was no duty owed to the plaintiff, and there may be some allegation in the legal malpractice claim about picking civvy over defendant. But even that allegation sort of defeats the whole idea that he owed a client relationship, because plaintiff is trying to argue that, well, because mom became incapacitated, all three siblings became coach-ruskies, so he owed us a duty, but you didn't do anything to stop my sister from hurting me. That, again, kind of goes to the poem, reasoning that you just can't create these attorney-client relationships by documents prepared, because then you end up with impossible conflicts that an attorney never agreed to, never thought that they'd end up in. That's why this argument that there has to be a contractual relationship is so important, because an attorney has to know what they're getting into, and has to agree to do that in order to take on an obligation to a client. And here, he's stating that you picked my sister over me, and that's because his client was Gene Sager. Gene Sager said, I'm giving power of attorney to my daughter, draft a document that demotes my sons, and that's what he did. And that's what all makes sense. It wasn't anything more nefarious. It's just he was doing what his client, Gene Sager, did. Now, there's a second amendment complaint, correct? Well, there's a proposed second amendment complaint that was attached to the motion for leave to file. And the second proposed amendment complaint was a legal malpractice? Yes. And then there was a count two pursuant to 725-1756, which is financial exploitation of an elderly person, right? Correct. There wasn't a count three, was there? No, there was not. So those were the two counts proposed? Those were the two counts proposed. And neither of those were aiding and abetting, which I've said is a separate tort. And furthermore, the trial court denied it after having granted summary judgment on the legal malpractice claim. And that was the first amendment? That was the first amendment complaint. Yes, first amendment complaint. And so that's what I was – so that's all we have before us on this appeal, correct? Correct. So those were the only attempts to have either complaints sounding in contract or statutory, right? Correct. And so that's the only thing we have in front of us? Correct. That and the attempt to amend? Correct. And that's all the trial court had before, too, obviously, because that's what's before you. But that puts the situation the trial court is trying to make a ruling on, whether or not there's a duty. And then on appeal saying, well, there's aiding and abetting. And there's just – the trial court wasn't in a position to make that determination. And to reverse the trial court on something that was never presented just is fundamentally improper. So the only thing we have in front of us is what the trial court ruled on, those motions, and then the motion to amend, whether or not there should be an allowance in the motion to amend. Correct. And that, I guess, would be – there was never an attempt to have a motion to amend to aiding and abetting? Correct. Below? Correct. Briefly on what was in the proposed Second Amendment complaint, it didn't cure the malpractice issue, it just added allegations. But the trial court had already ruled as a matter of law that there was no attorney-client relationship. So facts can be alleged as much as you want, I suppose, but the evidence before the court made the court determine as a matter of law there was no duty of care owed. You can't amend around a ruling on a matter of law on a duty. On the criminal co-exploitation of the elderly, there were numerous problems with that. The first was it was alleged more than two years after the original complaint had been filed as a completely new theory of recovery. And two years is sort of a magic number for lawyers because the Supreme Court has said in Evanston Insurance v. Reisberg that all claims arising out of the provision of legal services are subject to a two-year statute of limitations. And it doesn't matter if it's an attorney-client relationship or not, it's any claim against a lawyer, whether legal malpractice, fraud, breach of fiduciary duty, I assume aiding and abetting a tort, but then I would expect, though it hasn't been addressed yet, the exploitation of the criminal code. Furthermore, there was no surprise. The criminal code provides treble damages, so it just would triple the damages. Also, the plaintiff has no standing to bring it because either the victimized person or an estate has standing to bring such a claim as he was either a successor co-trustee, he has no standing, or as if he was a co-trustee, the Trustees Act says if you have three or more, a majority has to be able to do anything, and here we only have one plaintiff, so he doesn't have standing under either. And regardless whether anybody sitting here may have decided differently if they were sitting in the trial court on this issue, it's an abuse of discretion standard, and based on the previous ruling, granted summary judgment, based on the proposed Second Amendment complaint, it just can't be considered to be an abuse of discretion for the trial court to decide that at this point it was time for the litigation in the trial court to end. So the two questions are, was there a duty, and there wasn't, and was it an abuse of discretion to deny the motion for leave to amend, and there wasn't. So on the basis of that, we would ask the court to affirm the trial court. Thank you. Thank you. Thank you. I mentioned in my opening that defendants have been narrowing or trying to narrow this entire case down to one very specific question of attorney-client relationship between Mr. Stojan and Mr. Johnson. However, there's more to it, as was before the circuit court. Specifically, if we look at the court's October 6th order, the court specifically decided to address the issue of aiding and abetting, or as the court called it, being in cahoots between Mr. Stojan and Mr. Polite. Further, just in general, we have issues with respect to the facts. The counsel was discussing with you facts that actually haven't been decided yet. There's evidence. However, there's much dispute, and I have to point out that the October 6th order from the circuit court was apparently partially the result of the circuit court making factual determinations and coming up with witness credibility determinations when the court decided to state that Mr. Stojan practices in the area of estate planning and has done so for many years and enjoys a good reputation for his efforts. Had Mr. Stojan suspected foul play or diminished capacity in his client referring to misorders in his seizure, the outcome may have been different, but there's no evidence of that being the case either. Mr. Stojan's reputation doesn't have a place in summary judgment. That's a question for the trier of fact. Whether or not Mr. Stojan knew about Polite's foul play and whether or not Ms. Steger did have testamentary capacity in early 2011 are disputed issues of fact. But before you can get to any of that, don't you have to establish the number one issue of whether or not Mr. Stojan owed your client a duty? I mean, I think that that has to, you have to make that determination  Isn't that why the opposing counsel is saying that's why this is so narrow? There's only two issues because if we resolve the duty issue against your client, the other stuff doesn't matter. It does matter because the question of duty in this case is a question of law that's very fact intensive and should not be answered until the facts are settled by a trier of fact. There is evidence that begs the question, who was defendant's client and when? There is questions about Ms. Steger's testamentary capacity. Those matter. Now, I know client mentioned the concept of third party beneficiary status with an attorney. However, that is not something we have argued or that was even argued on summary judgment. The issue is derivative duty, not third party beneficiary of the will. It's a separate issue. So, that was something that was brought to the court's attention but was never specifically addressed. Also, with respect to just amending in general, we believe it's telling that in the same order, the December 2nd order, that denied Mr. Johnson's motion to reconsider and the motion for me to amend, the circuit court opened matters of summary judgment and matters of discovery in the case with which this case was consolidated. Given that the only difference between the two cases is the defendants in this case, the defendants in this case were not defendants in the other case, however, the discovery disputes were the same, it wasn't reasonable and arbitrary that the court reopened one case but closed the other. Thank you, counsel. Thank you. The court will take this under advisement and will stand at recess for now. Thank you.